**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-02768-WJM-STV

STATE OF COLORADO, and
JENA GRISWOLD, Colorado Secretary of State,

    Plaintiffs,

v.

LOUIS DEJOY, in his official capacity as Postmaster General,
UNITED STATES POSTAL SERVICE,
SAMARN S. REED, in his official capacity as Denver, Colorado Postmaster, and
CHRIS J. YAZZIE, in his official capacity as Albuquerque, New Mexico Postmaster,

    Defendants.

## DEFENDANTS' EXPEDITED MOTION FOR IMMEDIATE RECONSIDERATION, OF TEMPORARY RESTRAINING ORDER

Defendants Louis DeJoy, U.S. Postal Service, Samarn Reed, and Chris Yazzie (collectively, "Defendants," "USPS," or "Postal Service") respectfully move for immediate reconsideration of the Temporary Restraining Order ("TRO"), ECF No. 11. Defendants also request—to preserve their ability to secure the possibility of meaningful appellate review—that the Court grant or deny this motion by 3:00 p.m. today.[1]

### INTRODUCTION

Defendants recognize that the Court issued the TRO quickly, without the benefit of having heard from Defendants before issuing the TRO. Defendants ask the Court to reconsider

---

[1] Pursuant to D.C.COLO.LCivR 7.1(a), undersigned counsel conferred with counsel for Plaintiffs on September 12, 2020, regarding the relief sought in this motion. Plaintiffs oppose this motion.

its Order.  As explained in more detail below, the Postal Service, upon learning of Plaintiffs' lawsuit, ceased its processing of the Colorado-bound postcards that had not yet been dispatched for delivery, but a particular set of over 200,000 postcards had already been partially processed for delivery.  As to that set of postcards, the TRO will be extraordinarily difficult and perhaps impossible for Defendants to fully comply with at this juncture.  Also, there are several reasons why the TRO should have been denied.

First, the Court erroneously ruled that Plaintiffs showed a likelihood of success on three claims:  (1) a claim under the Elections Clause, ECF No. 11 at 2-3, (2) for "the same reasons," a claim under the Tenth Amendment, *id*. at 3 n.3 and (3) a claim based on alleged likely interference with Colorado citizens' right to vote.  *Id.* at 4.  As explained below, those claims fail, for multiple reasons, under the applicable law.  Plaintiffs allege the postcards create voter confusion, but even if true, that does not give them valid claims against the federal government.

Second, the Court erred in issuing the order before Defendants were provided an opportunity to respond.  Federal Rule of Civil Procedure 65(b)(1) provides that a court may not issue a temporary restraining order without notice unless the plaintiff shows that the harm will result "before the adverse party can be heard in opposition."  Here, Plaintiffs did *not* argue that this standard was met.  On the contrary, Plaintiffs requested a one-hour hearing on the motion for TRO, and provided contact information for counsel for Defendants.  ECF No. 6 at 2.  In addition, counsel for Defendants, upon receiving the motion for TRO, called the Court's chambers and left a voicemail with contact information and indicated that Defendants were available for a hearing.[2]

---

[2] Undersigned counsel was alerted on Friday evening, September 11, 2020, that Plaintiffs planned to file a motion for TRO, but undersigned counsel wishes to clarify that he did not reject

The Court's decision to rule without allowing Defendants to be heard in opposition deprived the Court of important factual information necessary for properly evaluating the motion for TRO. It also led the Court to apply the wrong legal standard. As explained further below, an elevated standard applied to Plaintiffs' TRO motion under the circumstances here, because delivery of the postcards to mailboxes was already ongoing this week, and full compliance with the TRO as to the remaining postcards will require more than a thousand employees to attempt manual extraction of postcards from hundreds of thousands of pieces of customers' mail.

Third, in ruling that Plaintiffs had shown that an injunction was needed to avoid irreparable harm, the Court relied on an inaccurate factual premise. The Court ruled that "the harm to Colorado and its residents will occur as soon as the Notice is distributed to its voters." *Id*. at 5. It appears that the Court relied on Plaintiffs' secondhand understanding about the status of delivery of the postcards—namely, that the postcards could be easily separated and had not yet been mailed. (In the TRO, the Court indicated that it was assuming the factual accuracy of Plaintiff's allegations in the motion. *Id*. at 4.) As explained below, this premise was inaccurate. Also, the event that the Court found that it had to issue the TRO to *prevent*—the delivery of the postcards—*had already occurred*: most Colorado voters have received the postcards; and of those that have been delivered, a majority were delivered by Friday, September 11, 2020.

Fourth, inaccurate assumptions led to errors in the Court's analysis of the balance of harms. The Court assumed that removing the notice from circulation "may impose limited

---

any request from Plaintiffs that the Postal Service delay any further mailing. He was not contacted, before the filing of the motion for TRO, to confer about the relief sought in the motion.

burdens on Defendants." *Id.* at 6. This assumption is inaccurate. Full compliance with the TRO will be extremely burdensome, requiring examination of mail by thousands of postal employees.

Fifth, the TRO orders other burdensome relief that Plaintiffs did not seek. *Cf. United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (explaining that courts generally must adhere to the "party presentation principle"). The sole relief Plaintiffs sought was an order prohibiting Defendants from delivering the notices, ECF No. 1 at 15; ECF No. 8 at 14, but the TRO goes further and orders Defendants to file, by September 17, 2020, "an accounting of **all** notices … which have already been mailed to postal patrons within the State of Colorado," ECF No. 11 at 9 ¶ 8. Full compliance with this *sua sponte* directive may not be possible.

Sixth, the Court failed to take into account the TRO's harm to Colorado voters and to the Postal Service. The Postal Service sent the postcards across the country for a valid public purpose: to encourage advance planning by those voters who intend to vote by mail—using the Postal Service to deliver their mail-in ballots—in the hopes of increasing the likelihood that their mail-in ballots would be timely received and counted and reducing the burden on the Postal Service of dealing with a crush of last-minute mailings. The postcards warn voters that rules vary by state, and they provide a useful link that aids them in locating their state's informational website. The TRO prevents these benefits from accruing.

Finally, the TRO finds that the postcard "provides patently false information regarding Colorado elections," and it rests its legal analysis on this premise that the postcards provide "false" information. ECF No. 11 at 3. That is not correct. Even if the Court views the postcard as having the potential to confuse voters, the postcards do not make false representations about Colorado law. They do not even describe state law. Rather, they alert voters that state rules

vary, refer them to local election officials, and provide links that make it easier for voters to locate their state's rules. Indeed, the state laws that may apply to Colorado voters may vary, as many Colorado voters are registered in other states. The postcards provide voters with encouragement to "prepare" and to "[g]ive … election officials ample time" by taking actions early, but they do not state that these are state deadlines. They also do not provide incorrect information about *non-mail* voting, but are directed to those who intend to mail their ballots.

For these reasons, the Court should reconsider, and deny, the TRO motion.

## BACKGROUND

**A.     The Postal Service mailed postcards to promote successful delivery of mail ballots.**

This year, in the midst of a pandemic, more people are expected to vote by mail than in any prior election cycle, and the Postal Service is preparing to handle delivery of ballots for those who choose to vote by mail. Ex. 1, Karpenko Decl. ¶ 10. To that end, it decided to send postcards to its customers to alert them to prepare to vote by mail. *Id.* The purpose of this postcard campaign was to help ensure that individuals who choose to vote by U.S. mail are able to do so successfully, and that their votes will be submitted in time to be counted. *Id.*

These postcards focus on voters who plan to vote by mail. *Id.* The postcards begin, "If you plan to vote by mail…." *Id.* The postcards do *not* state that the *only* way to vote is by mail; they simply address those voters who plan to use the U.S. mail in order to vote. *Id.* The postcards do not address other types of non-mail voting. *Id.*

The postcards include, in several places, encouragement for voters who plan to vote by mail to act early. *Id.* at 3. The postcards direct voters to "Give yourself and your election officials ample time to complete the process." *Id.* They also state that voters should "Request

5

your mail-in ballot (often called absentee ballot) at least 15 days before Election Day." *Id.* The Postal Service included this guidance because, for the significant majority of states throughout the country, the first step in the vote-by-mail process is to request a ballot. *Id.* ¶ 12.

The postcards did *not* describe state law. *Id.* ¶ 11. Given the practicalities of mailing more than 137 million postcards, the USPS decided to mail identical, simple postcards providing general guidance for successfully using the U.S. Mail to vote. *Id.* The postcards nowhere suggested that the USPS was providing instruction on specific state voting rules. *Id.* at 3.

On the contrary, the postcards directed voters to contact their election officials to determine the rules, and the postcards sought to assist voters in finding these rules online. *Id.* at 3. In the postcards' second bullet, they expressly warn voters, "Rules and dates vary by state, so contact your election board to confirm. Find links at usps.com/votinginfo." *Id.* That link, in turn, provides an easy link to a site where a user can select a state, which then provides a direct link to the relevant Secretary of State's voting page. *See* [https://www.usa.gov/election-office](https://www.usa.gov/election-office) (last visited September 12, 2020). The postcards encourage voters to follow their local rules. For example, the postcards direct voters to "follow the instructions" for ballots once received and to add postage to the return envelope "if needed." Ex. 1 at 3. The Postal Service's goal was thus to direct potential voters to their own state's websites.

The Postal Service had no intention of creating any confusion regarding voting procedures. *Id.* ¶ 17. The intent of the postcard campaign was the opposite: to ensure that individuals knew to consult their local elections rules, and to plan in advance if they intended to vote by mail in order to ensure that their ballots were timely delivered. *Id.* If clarification is needed, the Postal Service could add, on the website the postcards identify, a "Frequently Asked

Question" to explain that state rules vary on how voters obtain ballots, and that voters should follow the links USPS provides to their state website to receive official guidance. *Id.* at ¶ 18.

**B.     The TRO enjoins delivery of the postcards, but that delivery already occurred.**

Plaintiffs' motion for TRO stated that their understanding was that the "majority of these notices destined for Colorado currently sit at the Denver General Mail Facility…." ECF No. 8 at 13. That understanding was—and is—incorrect. Delivery of the postcards to mailboxes was ongoing this past week and is mostly complete. *See* Ex. 2, Graves Decl. at 5.

Earlier this week, pallets of postcards were received at processing centers in Colorado.[3] *Id.* ¶¶ 8-10. Nearly all of those pallets were broken down, fed into mail processing machines, and sorted (through a "multi-phase" sorting system) for delivery across Colorado. *Id.* ¶¶ 12-13. The Postal Service can track, with barcodes, when particular pieces of mail, like the postcards at issue, have proceeded through the sorting process and been dispatched for delivery. *Id.* ¶¶ 13-14.

A review of the data and observations of senior managers found that roughly 75% percent of Colorado-bound postcards were delivered this past week. *Id.* ¶ 15. The postcard-sorting began on Wednesday night or Thursday when the pallets were delivered. *Id.* ¶12 & p.5. Of the postcards delivered this week, about half had been delivered by Friday, September 11. *Id.* at 5.

**C.     Full compliance with the TRO may not be possible.**

The relief the Court granted—extracting each of the remaining postcards to prevent their delivery—will require a wide-ranging effort of thousands of Colorado postal employees, and

---

[3] In addition, the USPS maintains a distribution center in Albuquerque, New Mexico ("Albuquerque Plant"), which services the four corners region of the United States, including the southernmost part of Colorado. The Albuquerque Plant received its own pallets of postcards beginning approximately September 8, 2020. *Id.* ¶ 11.

perfect compliance is impossible to ensure.

Upon learning of Plaintiffs' lawsuit, the Postal Service ceased processing the remaining, Colorado-bound postcards that had not yet been dispatched for delivery. *Id.* ¶ 25. As noted above, over 75% percent of the total Colorado-bound postcards were already delivered. The Postal Service was able to segregate another roughly 15% of the total Colorado-bound postcards (about 333,041 postcards, *id.* ¶ 28) before these postcards entered the processing system. *Id.* ¶ 25. However, the remaining approximately 10% of the total Colorado-bound postcards (approximately 222,027 postcards) had already been partially processed for delivery. *Id.* For that set of 10% of the Colorado-bound postcards, the Postal Service has now suspended processing, but the postcards have already been presorted and comingled with other mail scheduled to be dispatched on Monday, and cannot be readily isolated from that mail. *Id.*

To comply fully with the Court's order, the Postal Service would need to take the following steps, which—even if executed with extreme care—may not be completely successful in ensuring that no further postcards are delivered. First, because approximately 75% of the postcards have already been delivered and 15% have been successfully segregated, the Postal Service's efforts would be directed only toward the 10% of postcards that have been partially processed for delivery. For these postcards, because the postcards can no longer be mechanically segregated from the remainder of the mail set to be delivered on Monday, Postal Service officials at the Denver distribution center need to—today— attempt to manually locate and extract the postcards from the hundreds of thousands of pieces of mail in which these postcards are currently embedded at the distribution center. *Id.* Although Postal Service will make a concerted effort to do this, given the size of this manual task, Postal Service officials may not be

able to successfully extract every one of the over 200,000 postcards from its mailings. *Id.*

Second, the Postal Service will also need to instruct each of its thousands of clerks and carriers across Colorado—*before* Monday, September 14—to search for and remove any remaining postcards that Postal Service officials failed to identify or extract at the distribution center. *Id.* ¶ 26. Clerks and carriers would then spend significant time over the next several days closely inspecting the mail that they deliver to *each individual address* in order to ensure that no postcard has been placed within that mail. *Id.* This process would be highly burdensome for the employees, may require overtime pay, and—most importantly—-would slow down the delivery of other important mail . *Id.* ¶ 27.

As a practical matter, achieving full compliance with the Court's order will be extraordinarily difficult. Many of the postcards might be extracted, but full compliance will require immediate instruction to more than a thousand carriers and contractors, on very short notice, through hundreds of post offices, all seeking to individually comply with the TRO. Given the scale of this human project, there is a significant likelihood that despite these efforts, some postcards will be inadvertently delivered in violation of the TRO.

## ARGUMENT

**I.      The Court erred in not applying an elevated standard to Plaintiffs' TRO motion.**

To obtain a temporary restraining order, Plaintiffs not only had to show four elements,[4]

---

[4]      Plaintiffs had to show four prongs: (1) a likelihood of success on the merits; (2) a likelihood that they will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in Plaintiffs' favor; and (4) that the injunction is in the public interest. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

but also had to meet an even higher burden because the specific relief they seek would require extraordinary affirmative efforts. As explained above, the relief Plaintiffs sought requires a complex effort by the Postal Service to locate and remove postcards from the mail of hundreds of thousands of customers. Because the TRO requires this affirmative effort, the injunctive relief was a kind that the Tenth Circuit has held is "specifically disfavored." *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019). A preliminary injunction is disfavored if "(1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win." *Id*. Here, the TRO effectively mandates action by thousands of postal employees. As explained below, Plaintiffs did not meet this elevated standard as to any of the four prongs.

## II.    Plaintiffs did not show a likelihood of success on their claims.

Plaintiffs did not identify any claim on which they have a likelihood of success. They speculate that the postcards may cause voter confusion, but none of their claims allow them to sue the federal government based on this speculation.

### A.    Plaintiffs' claim that the postcard "violates Colorado citizens' right to vote" fails for multiple reasons.

States do not vote. Accordingly, Plaintiffs, in their voting-interference claim, asserted a claim not on their own behalf, but on behalf of the State's citizens—that the postcards "interfere with the *rights of Colorado citizens* to vote." ECF No. 8 at 6 (emphasis added). This claim fails.

First, states lack the authority to enforce rights of their citizens against the federal government. Specifically, states generally cannot act as *parens patriae* for their citizens in their relations with the federal government, as both parties share the same citizens. *See Massachusetts*

*v. Mellon*, 262 U.S. 447, 485-86 (1923) ("[I]t is not part of [a state's] duty or power to enforce [its citizens'] rights in respect of their relations with the Federal Government."); *Massachusetts v. EPA*, 549 U.S. 497, 520 & n.17, 539 (2007) (explaining that while the *Mellon* bar allows a state to assert its own sovereign interests, it prohibits a state from acting as *parens patriae* to "protect her citizens from the operation of federal statutes"); *Government of Manitoba v. Bernhardt*, 923 F.3d 173, 179-83 (D.C. Cir. 2019) (applying the "*Mellon* bar" to find that a state could not act as *parens patriae* in a dispute with the federal government).

Second, while the TRO observes that the right to vote is fundamental, Plaintiffs do not claim here that voters are being denied the right to vote; they allege voter confusion. The TRO cites no cases providing that a citizen may sue a third party based on potential voter confusion.

Third, even if such a claim exists and Plaintiffs could assert it against the federal govermment, Plaintiffs have not shown that the postcards interfere with the right to vote. As discussed above, the postcards do not restrict any party from voting.

### B. The Elections Clause does not support a claim here.

The Constitution's Elections Clause grants states limited authority related to elections—to set, in the first instance, the time, place and manner for elections. It states that "[t]he times, places and manner of holding elections for" congresspersons "shall be prescribed in each state by the legislature thereof." U.S. Const., Art. I, § 4, cl. 1. The Elections Clause is a *limited procedural* grant of authority, giving state legislatures the authority "to prescribe the procedural mechanisms for holding congressional elections." *Cook v. Gralike*, 531 U.S. 510, 523 (2001); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832 (1995) ("The Framers intended the Elections Clause to grant States authority to create procedural regulations."). The "function

11

contemplated by [the Elections Clause] is that of making laws." *Smiley*, 285 U.S. at 366.

While the Elections Clause permits challenges to whether State legislatures have enacted elections laws permissible under the Elections Clause,[5] it does not override federal supremacy with respect to elections. Instead, the Elections Clause recognizes a principle of "federal supremacy over the procedural aspects of determining the times, places, and manner of elections." *U.S. Term Limits, Inc.* 514 U.S. at 810 (describing Congress's authority to preempt State election laws). It thus permits Congress to generally "make or alter such regulations." *Smiley v. Holm*, 285 U.S. 355, 363 (1932).

The TRO cites no authority for the proposition that the Elections Clause permits the claim Plaintiffs bring here against the federal government. First, nothing the Postal Service has done stops Colorado from setting election rules in Colorado. Colorado has enacted laws regarding voting by mail; those laws remain operative. The postcards do not instruct voters to disregard state rules; on the contrary, they expressly direct voters to consult their states' rules.

Second, even if Plaintiffs *had* demonstrated that Defendants were interfering with an election process (which they have not), they cite no authority showing that this Clause provides a basis for any restrictions on *federal* authority, or that a state may sue the federal government.

Finally, Plaintiffs cite no cases suggesting that the Elections Clause gives States a right to

---

[5] *See*, *e.g.*, *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 831-35(1995) (an Arkansas law that functionally created congressional term limits could not be justified under the Elections Clause); *Roudebush v. Hartke*, 405 U.S. 15, 26 (1972) (Indiana Senate election vote recount was consistent with the Elections Clause); *Cook v. Gralike*, 531 U.S. 510, 525 (2001) (Missouri law which required that ballots must identify a candidate's position on term limits could be justified under the Elections Clause); *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 459 (2008) (Washington State blanket primary was permissible exercise of Elections Clause power).

sue anyone—let alone that states may bring claims under the Elections Clause when a third party's actions might cause "confusion."

### C. The Tenth Amendment claim fails for the same reasons.

As the TRO recognized, Plaintiff's Tenth Amendment claim rests entirely on its Elections Clause theory, ECF No. 3 at 3, and it fails for the same reasons. Plaintiffs cited no authority that states have a freestanding right to assert claims against the federal government under the Tenth Amendment when a dispute arises about information relating to elections.[6]

### III. Plaintiffs did not show irreparable harm.

To obtain a TRO, Plaintiffs had to show that injunctive relief was necessary to prevent irreparable harm. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009). An injunction may be unwarranted if the harm has occurred. *See United States v. Bolton*, No. 1:20-CV-1580 (RCL), 2020 WL 3401940, *4 (D.D.C. June 20, 2020) (declining to find irreparable harm where copies of a book containing classified information had been released and "the horse is already out of the barn"). Also, "[t]o constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). "Purely speculative harm will not suffice." *RoDa*, 552 F.3d at 1210. Plaintiffs did not meet these standards.

---

[6] The Court did not address Plaintiffs' remaining claims, none of which provide Plaintiffs with a claim here. First, 52 U.S.C. § 10101 provides no claim against the federal government. It permits the U.S. Attorney General to bring a civil action. § 10101(c). Even if there were a claim, private parties must wait to sue; only the Attorney General may skip the waiting period. Second, 52 U.S.C. § 20510 does not provide a claim against the government; nor have Plaintiffs shown the Postal Service issued the cards to intimidate, threat, or coerce voters. Third, 52 U.S.C. § 20302 does not provide a claim a state may assert against the federal government, or a legal standard the federal government must follow.

First, the postcard the delivery that the TRO enjoins has, for the most part, already occurred. Plaintiffs argued that the remedy they seek—to stop voters from receiving postcards—would be effective only if done before distribution began, and they assumed distribution had not begun. ECF No. 8 at 13 ("To Plaintiffs' knowledge, the majority of these Notices destined for Colorado currently sit at the Denver General Mail Facility, ready to be distributed… Once distribution begins, the 'horse will be out of the barn….'"). The Court's TRO took the same view—that the harm would occur "as soon as the Notice is distributed to voters." ECF No. 11 at 5. But as explained earlier, most of the postcards were already delivered in Colorado.

Second, the TRO observes that restrictions on voting may amount to irreparable injury. ECF No. 11 at 5. But Plaintiffs' claim is not that the Postal Service has imposed voting restrictions, but that it has created voter confusion. The TRO cites no authority that the possibility of voter *confusion* shows irreparable injury. Indeed, the TRO, by directing the parties to consider what steps to take as to postcards that were already mailed, ECF No. 9, reflects the reality that potential voter confusion is not an *irreparable* harm but one subject to remediation.

Third, all the specific harms the TRO identified were speculative and not irreparable. For example, the TRO finds that voters "may wonder" about several things: if Colorado election laws have changed, or if their registration has lapsed, and other questions about the rules. ECF No. 5. Even if voters wonder these things, the postcards provides a direct method of addressing any voter confusion: they alert voters that state rules vary, direct voters to consult their local election officials, and facilitate this process with a link that makes it easy for voters to find the state website that will hold the answers to those questions. None of the potential questions the

Court identifies in the TRO are ones that the state website could not address.[7]  Moreover, by directing voters to the correct website, the postcards may reduce the number of voters who contact election officials with questions.

### IV.     The balance of equities and public interest favored denying the TRO motion.

As discussed above, Defendants' position is that under Fed. R. Civ. P. 65(b)(1), they should have been provided with an opportunity to respond.  Because the TRO was entered before Defendants responded, the TRO reflects other errors.  In particular, the TRO, in its analysis of the balance of equities and the public interest, did not take into account important factors.  First, it did not acknowledge that the Postal Service has a legitimate goal in using these postcards to encourage advance planning for those who plan to vote by mail; the postcards may aid the Postal Service in avoiding a flood of last-minute mail-in voting.  Second, the TRO did not acknowledge that the postcards provide an easy way for voters to find their way to a state website to address any confusion.  Third, the TRO did not take into account that the TRO is of limited public value, as most of the postcards were already delivered.  Fourth, the TRO was entered without recognition that full compliance with the TRO may be impossible.

### CONCLUSION

Defendants request that the Court vacate the TRO, taking into account that—especially as to the 10% of already-sorted postcards—compliance with the TRO may be impossible.

---

[7]     Plaintiffs have suggested that the postcards are improper because they may reach individuals other than registered voters.  ECF No. 8-1 at ¶ 32.  But contacting unregistered voters is not a harm.  Some Colorado voters may be eligible to register to vote and still could, since Colorado permits registration up to Election Day.  Plaintiffs also point out that overseas and military voters may request an electronic ballot until 7:00 p.m. on Election Day.  ECF 8-1 at ¶ 33.  But the postcard is clearly directed to voters who plan to vote by mail, not electronically.

Respectfully submitted this 13th day of September, 2020.

                                        JASON R. DUNN
                                      United States Attorney

                                      s/ *Kevin Traskos*
                                      Kevin T. Traskos
                                      Lauren M. Dickey
                                      Assistant United States Attorneys
                                      1801 California St., Ste 1600
                                      Denver, Colorado 80202
                                      Telephone: (303) 454-0100
                                      Email: Kevin.Traskos@usdoj.gov
                                      Attorney for Defendants

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on September 13, 2020, I electronically filed the foregoing with the Clerk of Court using the ECF system, which will provide notice to the following parties:

Emily B. Buckley
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720-508-6403
Email: emily.buckley@coag.gov

Eric R. Olson
Colorado Attorney General's Office-Dept. of Law
Ralph Carr Judicial Building
1300 Broadway
10th Floor
Denver, CO 80203
720-508-6548
Email: eric.olson@coag.gov

Michael T. Kotlarczyk
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720-508-6187
Fax: 720-508-6041
Email: mike.kotlarczyk@coag.gov

Peter G. Baumann
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720-508-6152
Email: peter.baumann@coag.gov

LeeAnn Morril
Colorado Attorney General's Office

Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720-508-6000
Fax: 720-508-6032
Email: leeann.morrill@coag.gov


                                            s/ *Lauren M. Dickey*
                                            Lauren M. Dickey
                                            United States Attorney's Office