**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 20-cv-2768-WJM-STV

STATE OF COLORADO, and
JENA GRISWOLD, Colorado Secretary of State,

    Plaintiffs,

v.

LOUIS DEJOY, in his official capacity as Postmaster General,
SAMARN S. REED, in his official capacity as the Denver, Colorado Regional Postmaster,
CHRIS J. YAZZIE, in his official capacity as the Albuquerque, New Mexico Regional Postmaster, and
UNITED STATES POSTAL SERVICE,

    Defendants.

## ORDER DENYING DEFENDANTS' MOTION FOR RECONSIDERATION

Plaintiffs State of Colorado and Secretary of State Jena Griswold (jointly, "Plaintiffs"), filed this lawsuit against Louis DeJoy, in his official capacity as Postmaster General, Samarn S. Reed, in his official capacity as the Denver, Colorado Regional Postmaster, Chris J. Yazzie, in his official capacity as the Albuquerque, New Mexico Regional Postmaster, and the United States Postal Service (collectively, "Defendants") to enjoin Defendants from delivering by mail to Colorado households a notice regarding the 2020 election.[1]

On September 12, 2020, the Court issued a Temporary Restraining Order

---

[1] A copy of the notice at issue in the TRO ("Notice") is attached as Exhibit A to the Declaration of Judd Choate, Director of Elections for the Colorado Secretary of State. (ECF No. 8-2.)

("TRO") enjoining Defendants from delivering the Notice by mail to Colorado households. (ECF No. 11 at 8.)

Currently before the Court is Defendants' Expedited Motion for Immediate Reconsideration of Temporary Restraining Order (the "Motion"), filed on September 13, 2020. (ECF No. 12.) For the reasons explained below, the Motion is denied.

## I. LEGAL STANDARD

District courts have broad discretion to reconsider their interlocutory rulings before the entry of judgment. *See Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1251 (10th Cir. 2011). Thus, a court can alter its interlocutory orders even where the more stringent requirements applicable to a motion to alter or amend a final judgment under Federal Rule of Civil Procedure 59(e), or a motion for relief from judgment brought pursuant to Rule 60(b), are not satisfied. *See Nat'l Business Brokers, Ltd. v. Jim Williamson Prods., Inc.*, 115 F. Supp. 2d 1250, 1256 (D. Colo. 2000).

"[T]o succeed in a motion to reconsider, a party must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision. *Id.* Even under this lower standard, "[a] motion to reconsider . . . should be denied unless it clearly demonstrates manifest error of law or fact or presents newly discovered evidence." *Id.*

## II. ANALYSIS

### A.  Heightened Standard

Defendants contend that the Court erred in applying the traditional TRO standard instead of the heightened standard for disfavored injunctions. (ECF No. 12 at 10.) The

Court disagrees.

The Tenth Circuit applies a heightened standard for "[d]isfavored preliminary injunctions," which do not

> merely preserve the parties' relative positions pending trial. Instead, a disfavored injunction may exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win. To get a disfavored injunction, the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors: She must make a strong showing that these tilt in her favor.

*Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (citations and internal quotation marks omitted). Although Defendants attempt to characterize the TRO as an injunction affirmatively mandating action, it actually *prohibits* action. (ECF No. 11 at 8 ("Defendants . . . are hereby IMMEDIATELY ORDERED AND RESTRAINED FROM delivering by mail to Colorado households the official notices attached as Exhibit A to the Declaration of Judd Choate, Director of Elections for the Colorado Secretary of State (ECF No. 8-2).").) The TRO preserves the current status quo by *prohibiting* Defendants from undertaking a specific act – that of mailing the Notice to Colorado households. Nothing in the actual text of the injunctive language itself mandates any affirmative act whatsoever.

Moreover, even were the Court to unreasonably strain the meaning of its own injunctive language to somehow transform the prohibition of an act the legal (and factual) equivalence of ordering an affirmative act, that strained reality is a consequence of Defendants' own making. Plaintiffs state—and Defendants do not contest or otherwise provide any controverting evidence to the contrary—that Plaintiffs

began objecting to what they believed were the misstatements in the Notice as early as Thursday, September 10, 2020, and that Defendants were informed on Friday, September 11, 2020 that litigation was imminent absent some opportunity to informally resolve the parties' dispute.  (ECF No. 14 at 8–9.)   In the face of all this, Defendants steadfastly held to their previously-planned course of conduct and continued to mail the Notice to Colorado households.  Had they not done so, there would be no need at this point of these proceedings for the Court to require any affirmative disruption of the *status quo ante.*

Accordingly, Defendants have failed to establish that the Court erred in applying the traditional standard for a TRO.

**B.**     **Likelihood of Success**

Defendants argue that the Court erred in finding that Plaintiffs are likely to succeed on the merits because Plaintiffs lack the authority to assert claims relating to Colorado citizens' right to vote.  (ECF No. 12 at 10.)  In particular, Defendants cite to *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923), which bars states from acting as *parens patriae* for their citizens in relations with the federal government.  (*Id.* at 10–11.)

However, in *Massachusetts v. Mellon*, the Supreme Court left open the possibility that states could sue the federal government to vindicate certain rights on behalf of its citizens: "We need not go so far as to say that a state may never intervene by suit to protect its citizens against any form of enforcement of unconstitutional acts of Congress."  *Id.* at 485; *see also Mass. v. EPA*, 549 U.S. 497, 520 n.17 (2007) (allowing

State "to litigate as *parens patriae* to protect quasi-sovereign interests—*i.e.*, public or governmental interests that concern the state as a whole").

Based on the limited record before it at this stage of the proceedings, the Court finds that the Notice implicates Plaintiffs' quasi-sovereign interests in the integrity of its own elections.  *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982) (recognizing the State has an interest in "assuring that the benefits of the federal system are not denied to its general population").  Accordingly, because Colorado has a quasi-sovereign interest in ensuring that its citizens can exercise their fundamental right to vote without federal interference, Plaintiffs have standing here to assert claims on behalf of Colorado citizens.  The Court does not, however, rule out the possibility that at a later time it may reassess this conclusion, having then the benefit of more comprehensive briefing and research on this issue.

Moreover, Plaintiffs also remain perfectly free to also assert their own constitutional claims relating to Colorado's authority under the Elections Clause to determine the "Times, Places and Manner of holding Elections for Senators and Representatives."  U.S. Const., Art. I, § 4, Cl. 1.

Defendants argue that the Notice does not affect Colorado's authority under Elections Clause to set its election rules within the state.  (ECF No. 12 at 11–13.)  However, the Supreme Court has explicitly recognized that the States' authority under the Elections Clause is comprehensive and "embrace[s] authority to provide a complete code for congressional elections," including "*in relation to notices.*"  *Smiley v. Holm*, 285 U.S. 355, 366 (1932) (emphasis added).  Although the Constitution allows *Congress* to override a State's authority regarding its elections, it does not extend the same authority

5

to the Postal Service – an agency of the federal executive branch. Defendants cite to no authority–and the Court is aware of none–which would permit this constitutional authority, specifically delegated to Congress, to be massively enlarged so as to cloak the Postal Service and its agents with the power over-ride the election functions of a state sovereign.

Accordingly, Defendants have failed to establish that the Court erred in determining that Plaintiffs have established that they are likely to succeed on the merits of their claims.[2]

**B.      Irreparable Harm**

Defendants contend that Plaintiffs failed to establish that injunctive relief was necessary to prevent irreparable harm. (ECF No. 12 at 13–15.) In particular, they argue that the Court relied on an "inaccurate factual premise" when it issued the TRO because Defendants have already delivered the Notice to approximately 75% of Colorado households. (*Id.* at 7.)

However, even assuming that 75% of Colorado households have already received the Notice, the TRO still prevents irreparable harm from being inflicted on the remaining 25% of households. By Defendants' own estimate, there are approximately 555,068 Notices that have not yet been distributed to Colorado households. (*Id.* at 8.) The imminent distribution of false and misleading voting information to *over half a*

---

[2] Defendants also argue that "Plaintiffs cited no authority that states have a freestanding right to assert claims against the federal government under the Tenth Amendment when a dispute arises about information relating to the elections." (ECF No. 12 at 13.) Defendants do not, however, cite any authority suggesting that the Court's findings with respect to the Tenth Amendment were clearly erroneous. It has therefore failed to establish that reconsideration is warranted at this time. *Nat'l Bus. Brokers, Ltd.*, 115 F. Supp. 2d at 1256.

*million* Colorado households constitutes irreparably harm.[3]

### C.     Balance of Harms

Defendants argue that "[f]ull compliance with the TRO will be extremely burdensome, requiring an examination of mail by thousands of postal employees." (ECF No. 12 at 4.)  They represent that approximately 75% of the Notices were already delivered to Colorado households this week.  (ECF No. 12 at 7.)  Upon learning of the TRO, Defendants were able to segregate 15% of the total Colorado-bound Notices before they entered the processing system.  (*Id.* at 8.)  The remaining 10% of the total Colorado-bound postcards, however, had already been partially processed for delivery. (*Id.*)

After the Court issued the TRO, Defendants took many administrative steps to prevent the partially-processed Notices from being delivered to Colorado households. According to the Supplemental Declaration of Gregory Graves, approximately 30 Postal Service employees have *already* manually inspected mail and attempted to remove the Notices from the processing system.  (ECF No. 20-1 ¶ 5.)  They have also *already* "issued a directive to all USPS post offices around the State of Colorado advising them that the USPS had ordered to stop delivery of the [Notices]."  (*Id.* ¶ 6.)  In other words, Defendants have already incurred most of the administrative burdens to preserve the

---

[3] Defendants also argue that Plaintiffs fail to establish that potential voter confusion is an irreparable injury.  (*Id.* at 14.)  As Plaintiffs point out, "the harm is not mere uncertainty."  (ECF No. 14 at 7.)  Instead, the Notice delivers false and misleading information to Colorado voters about when they should request and submit their ballots.  This implicates Colorado's constitutional right to determine the time, place, and manner of its elections, as well as Colorado voters' fundamental right to vote.  *See Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016) ("when an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary").

7

status quo and comply with the TRO. Accordingly, Defendants' arguments about the harms resulting from compliance with the TRO do not justify reconsideration.[4]

## D.     Defendants' Arguments Regarding Statutory Grounds

In their opening and reply briefs, Defendants spend substantial time addressing grounds of relief that the Court did not rely on in issuing the TRO. (ECF Nos. 12, 14; see also ECF No. 11 at 4 n.4 ("Because Plaintiffs have shown a likelihood of success on their constitutional claims, the Court need not address their statutory claims at this time.").) Because the Court did not make *any* findings about Plaintiffs' statutory claims, it will not address Defendants' arguments that those claims lack merit and warrant reconsideration of the TRO. In other words, the Court will not undertake to "reconsider" findings or conclusions it never made in the first instance.

## III. CONCLUSION

Accordingly, for the reasons set forth above, the Court ORDERS as follows:

1.  Defendants' Expedited Motion for Immediate Reconsideration of Temporary Restraining Order (ECF No. 12) is DENIED;

2.  The Temporary Restraining Order (ECF No. 11) REMAINS IN FULL FORCE AND EFFECT; and

3.  The briefing schedule set forth in the Temporary Restraining Order for the construed motion for a preliminary injunction remains in place.

---

[4] Defendants also argue that the Court did not consider that the Notice: (1) encouraged advance planning for those who planned to vote by mail to prevent a "flood of last-minute mail-in voting"; and (2) provides voters a method to check their state's voting rules. (ECF No. 12 at 15.) The Court finds that the Notice's benefits pale in comparison to the fact that it conveys to Colorado residents false and misleading information about Colorado's voting deadlines.

Dated this 14th day of September, 2020.

BY THE COURT:

_____
William J. Martinez
United States District Judge